# ARIMOND VS. THE GREEN BAY AND MISSISSIPPI CANAL COMPANY.

*Constitutional Law.— Navigable Streams.— Compensation for flowage of lands.—Prescription — Limitation of Actions.— Construction of statutes.— Pleading.*

1. The act of the territorial legislature of 1848 (Terr. Laws of 1848, p. 129), authorizing certain persons to construct a dam across the northern outlet of Lake Winnebago, to enable them to make use of the waters of the river for hydraulic purposes, provides (sec. 2) that "said dam shall not exceed seven feet in height above high water mark of said river: *provided,* that said dam shall not raise the water of Lake Winnebago above its ordinary level," etc. It appearing from the pleadings herein that the dam maintained by defendant at that place, or *any* dam suitable for hydraulic purposes, or which would create a power, would necessarily "raise the water of Lake Winnebago above its ordinary level:" *Held,* that the act was inoperative, and conferred no authority for the erection of such dam.

2. The act declares that the grantees of the franchise "shall be subject to, and entitled to all the benefits and provisions of," the Mill Dam Law then in force. Defendant's dam not being within the protection of the act, *Held,* that said act does not operate to restrict plaintiff's remedy for flowage of his land to the provisions of the Mill Dam Law.

3. Whatever rights the state may have, as against riparian proprietors, over the bed of a navigable stream and the waters flowing therein, *within* the banks and below high water mark, it cannot, for the purpose of improving the navigation, authorize the obstruction of the channel so as to *overflow the lands* of citizens, without providing that *compensation* shall be made therefor.

4. By an act of the *state* legislature (Laws of 1848, 1st sess., p. 62), damages for such flowage of land caused by the improvement of the Fox and Wisconsin rivers are provided for, and directed to be "paid out of the fund appropriated to said improvements," which fund was created by sale of lands granted to the state by congress for that purpose. *It seems* that this was a legitimate appropriation of said fund; but it was not necessary to determine that question in this case.

5. The flooding of land by artificial obstructions placed in a running stream is a *taking* of the land, within the meaning of the constitutional provision which requires compensation to be made for private property taken for public use. *Alexander v. Milwaukee,* 16 Wis., 248, distinguished; and *Pettigrew v. Evansville,* 25 Wis., 223, approved.

6. Plaintiff did not take his title from the United States to lands adjacent to Fox river, burdened with an easement which authorized the flowage of his land by means of structures erected for the purpose of improving the navigation of that river — there being no such reservation in the patent.

7. A plea of prescription for such an easement must show an adverse user for *twenty* years, and not for *ten* years only.

8. A statute of limitation cannot be applied to a cause of action as to which the period limited had expired *before* the passage of the act, or would expire so soon thereafter as not to allow plaintiff reasonable time for bringing suit.

9. Whether the period of *one year* after the passage of ch. 184, Laws of 1862, within which, by the terms of the act, a party whose lands had been flowed by a mill dam for ten years before its passage, might bring his action therefor, was a *reasonable time*, and rendered the act valid as applied to such cases, is not here decided; such one year limitation not having been *pleaded* in the action, and it not appearing that the dam in question was a mill dam.

10. The answer alleges that the dam here in question, " in manner and form in which it was built, contrived, erected, completed, maintained and continued," was and always had been " an essential, necessary and integral part of the said works of improvement of the navigability of the Fox and Wisconsin rivers," etc. It also alleges that the same is " a dam of the class referred to " in ch. 184, Laws of 1862. *Held*, that the latter averment is merely of a conclusion of law, and not sufficient, in view of the former, to show that said dam is a mill dam.

APPEAL from the Circuit Court for *Fond du Lac* County.

The complaint averred that for six years last preceding the action, the defendant company had wrongfully maintained " a certain dam and obstruction " across the north channel of the outlet of lake Winnebago, at the village of Menasha, by means whereof the water of the lake had been raised and flowed back upon certain described premises of the plaintiff adjacent to said lake, and had wholly submerged the same, etc., to plaintiff's damage $6,000.

The answer, first, denies generally the averments of the complaint, except as afterwards admitted. It then sets up five additional defenses:

II. The second defense is substantially as follows: In 1848, the territorial legislature of Wisconsin passed an act, approved March 10 of that year, by the first section of which "Curtis Reed and his associates" are authorized "to construct a dam across the north channel or outlet of Winnebago lake, at such point as they may deem suitable, on the fractions of section 22," in a certain designated township, "and to make use of the waters of said river for hydraulic purposes;" while the second section declares that "said dam shall not exceed seven feet in height above high water mark of said river: *provided*, that said dam shall not raise the water in lake Winnebago above its ordinary level; and the said Curtis Reed and his associates, their heirs and assigns, shall be subject to, and entitled to all the benefits and provisions of, the act relating to mills and mill dams, approved January 13, 1840." Said fractions of section 22, at the place where the dam was afterwards erected, were situate upon the north channel or outlet of said lake, at least one and one-half miles distant from the lake at the place of entrance to such outlet; the natural fall between those points was and is at least nine feet, and the current was full and rapid; and the fact was and is, that "the placing of a dam across said outlet not high enough to serve any hydraulic or useful purpose would nevertheless cause the waters to pile up in said lake to some extent above its ordinary level." Said Reed and his associates built a dam under and by virtue of said act, and at the place there designated, and this is the dam described in the complaint. Afterwards, and after the admission of Wisconsin as a state into the union, and after the acceptance by said state of the grant of land made by congress to aid in the improvement of the Fox and Wisconsin rivers, to wit, on or about the 8th of August, 1848, the legislature of this state passed an act, approved on the day last named, entitled "an act to provide for the improvement of the Fox and Wisconsin rivers and connecting the same by a canal," to which act and the several acts amendatory thereof, and those relating to the

board of public works, reference is made. The board of public works, organized pursuant to the act of August 8th, entered into a contract with Reed and his associates, by which the latter agreed to complete the erection of said dam previously commenced by them, and that when completed it should be the property of the state; and they accordingly completed the same in or prior to the year 1852; "which dam, when so completed, was built to a height no greater than that authorized by said act" of March 10, 1848. Reed and his associates thereupon released to the state said dam, and all their right, etc., in and to the same. Ever since that time the dam has been maintained at the same height and in the same manner. About the same time a certain other dam was built by other parties, under legislative authority, across the *south* channel of said Fox river, and has ever since been there maintained; and by means of said *two* dams, and not because of the dam first aforesaid, if at all, the waters of said river and of lake Winnebago were set back and made to overflow or otherwise injure plaintiff's premises.

The answer then sets up the " act to incorporate an association for the completion of the improvement of the Fox and Wisconsin rivers," approved July 6, 1853 (Laws of 1853, ch. 98), under which the Fox and Wisconsin Improvement Company was organized; and alleges that under said act said company was required to construct, repair and maintain said dam, and the state granted and conveyed to the company, with other property, etc., said dam, and the privilege of constructing and repairing the same, and all other rights and privileges belonging to the improvement, etc. It then sets up the act of the legislature, approved April 13, 1861, entitled "an act to facilitate the sale of the lands and other property of the Fox and Wisconsin Improvement Company, to provide for the proper application of the proceeds of such sale, and to authorize the formation of a corporation by the purchasers," and the acts amendatory thereof; and it alleges that, by virtue of these acts,

on the 15th of August, 1866, defendant became and ever since has been a corporation, etc.; and that on or about the 16th of August, 1866, defendant received a conveyance and thereby became seized of said dam, and of the privilege of constructing and repairing the same, and all other rights and privileges belonging to the improvement which the Fox and Wisconsin Improvement Company at any time held therein; and that said dam had ever since been maintained under and by authority from the defendant.

III. It is further alleged that the supposed cause of action mentioned in the complaint did not accrue at any time within ten years next before the commencement of the action.

IV. The above mentioned acts of the territorial and state legislatures are again set up in the fourth defense; and it is then alleged that by the act of building the dam aforesaid, and by the building by other parties of said other dam across the south channel of the Fox river, " and by means of the waters of said lake Winnebago, the said Reed and his associates, and the said state by its board of public works, did, as they lawfully might do, seize, and, to the extent necessary, and for the purposes of a water power and of said improvements, take possession of," the premises mentioned in the complaint, so far as they were in fact submerged, etc., if at all ; and that ever since the completion of said dam, in 1852, they and this defendant, and the intermediate grantees of said works of improvement, etc., have respectively held continuous, uninterrupted and exclusive possession of the same ; that said seizure and taking of possession were made under claim and color of right and title duly made by virtue of the laws of this state aforesaid, and were so made publicly and notoriously, and with the knowledge and acquiescence of the lawful owners of the said premises ; that under the like claim and color of title, in like manner and with like knowledge and acquiescence, the possession thereof has since been and is now maintained ; and that during all of said time said owners were not under any legal disability to sue, etc.

V.   The answer then further alleges that the dam mentioned in the complaint, ever since its construction, has been and is " a dam of the class and character referred to in the act of the legislature of Wisconsin," approved April 2d, 1862, published as ch. 184, Gen. Laws of 1862; that the same was fully constructed prior to said April 2, 1862, to wit, in or about or prior to the year 1852; and that the flowage of plaintiff's land by reason thereof, if any, had continued more than ten years preceding the commencement of the action.

VI.   The sixth defense alleges that under the provisions of the ordinance of 1787 for the government of the territory northwest of the river Ohio, and of an act of congress relating thereto passed August 7, 1789, and of the act of congress of 1836 establishing the territorial government of Wisconsin, and of the act of congress of 1846 relating to the admission of Wisconsin into the Union as a state, and of the constitution of this state, etc., the navigable waters leading into the Mississippi and St. Lawrence, and the carrying places between them, are declared to be common highways and forever free, etc.; and that the Fox and Wisconsin rivers and lake Winnebago are among the navigable waters so described.   It then recites the act of congress of 1846 granting lands to the state of Wisconsin to aid in the improvement of said two rivers, etc.; the acceptance of such grant by the state, and the subsequent legislation and events showing that the dam here in question was built and maintained under the authority of the laws of the United States and of this state for the purpose of improving the navigability of said waters; and it closes with the following averments:

" That the said dam, in the manner and form in which it was built, contrived, erected, completed, maintained and continued, to wit, as mentioned in the said complaint, was, ever since it was so built has been, and now is, an essential, necessary and integral part or portion of the said works of improvement, and necessary to the proper improvement of the navigability of said

Fox and Wisconsin rivers, and to the proper development and enlargement of their capacity as common navigable highways; that in and by the ordinance, acts of congress, and laws herein referred to, the United States reserved for the purposes aforesaid, and with the said works of improvement subsequently granted, assigned, and transferred to the said state (under which the defendant claims and holds), the easement or right and privilege of overflowing, damaging, undermining, destroying, saturating, subverting and otherwise injuring the lands, premises and buildings mentioned in the said complaint, to the extent and in the manner in which they were injured, etc., if at all, and to the extent necessary in order to improve the navigability of the Fox and Wisconsin rivers; that the lands and premises, described in said complaint, were granted by the gen eral government, long subsequent to the several acts of con gress aforesaid, and particularly the act of congress approved August 8th, 1846, and were so granted with full notice of and subject to the easement or right aforesaid, therein and thereupon reserved, and prior thereto granted to said state for the purposes aforesaid; and that each and all of the subsequent grantees of the said lands and premises, including the said plaintiff, if such a grantee, purchased the said lands and premises with full notice at the time thereof, and subject to the same easement," etc.

The plaintiff demurred to all the defenses after the first, for insufficiency; and from an order sustaining the demurrer defendant appealed.

*Stevens, Flower & Morris*, for appellant:

1. The second defense alleges that the natural descent in the bed of the north channel of the Fox river, between lake Winnebago and the point where the dam in question is built, is at least nine feet, and the current full and rapid, and that a dam on section 22, not high enough to serve any hydraulic or useful purpose, would nevertheless cause the water to *pile up* in said lake to said extent above its ordinary level. These facts

did not appear in defendant's pleas in the *Pumpelly* case (13 Wall., 166). In the light of such facts, what construction should be given to the provisions of section 2 of the act of 1848, authorizing the construction of the dam by Reed and others? The proviso should not be so construed as to defeat the object of the act. The proper construction is one which will, if possible, permit both the grant and the proviso to stand. In order that the grant may stand, permission must be given to raise the water at the dam sufficiently high for hydraulic purposes; and in order that the proviso may stand in connection with the grant, the waters of the lake must not be raised above the point where the " piling up " of water ceases; consequently the proper construction is, that the dam may be raised to a point not exceeding seven feet above high water mark, and not exceeding a point at which the water *at the top of the dam* will not be raised above the ordinary level of the waters of the lake.. While the language of the proviso is plain, its meaning is ambiguous, and we are left in doubt as to the intention of the legislature in using it. This being so, the whole act is to be construed so as to give effect to the grant, clearly expressed in the first section. *State v. Williams*, 8 Ind., 191; *Ingraham v. Speed*, 30 Miss., 410; *Blunt v. Walker*, 11 Wis., 334; *Monongahela Bridge Co. v. Kirk*, 46 Pa. St., 112. Counsel further argued that if the construction and maintenance of the dam were authorized by the Reed charter, then, by the terms of that act, plaintiff's remedy would be only under the Mill Dam Law. 2. Counsel contended that the facts alleged in the second defense showed defendant's authority to maintain the dam, not only under the Reed charter, but also under the act establishing the board of public works, approved August 8, 1848; that the state, having accepted the grant of lands " for the purpose of improving the navigation of the Fox and Wisconsin rivers," was authorized to erect such dams as would accomplish that object; that although the state had acquired the right granted to Reed in respect to the dam, it was not subject to the restric

tions imposed upon him; that defendant had succeeded to the rights of the state; that the provision of sec. 17 of the act of August 8th for the payment of damages for any lands, etc., "appropriated by the board to the use of the public in the construction of said improvements," "out of the fund appropriated to said improvement," were not applicable to a case of injury from the flowage of lands, or, if applicable, were so far void, as in conflict with the act of congress granting the land from the sale of which such fund was derived; and that the state was under no obligation to make compensation in such cases. *McKeen v. Delaware Canal Co.*, 49 Pa. St., 424, 439; *Hollister v. Union Co.*, 9 Conn., 436, and cases there cited. 3. Counsel further argued that the facts alleged in the fourth defense show that defendant has acquired a right to flow defendant's land by prescription; that the taking of said land, if any, became perfect in 1852 or 1853; that the provision of the act of August 8, 1848, for compensation being void, the taking by the state under that act was hostile to plaintiff's title (unless that title was subordinate to a paramount right of the state, as averred in the *sixth* defense); that by sec. 6, ch. 138, R. S., "whenever it shall appear that the occupant, or those under whom he claims, entered into the possession of any premises *under claim of title, founding such claim upon some written instrument as being a conveyance* of the premises, * * and that there has been a continual occupation and possession of the premises included in such instrument, * * under such claim for *ten* years, the premises so included shall be deemed to have been held adversely;" that by sec. 10 of the same chapter, "an adverse possession of ten years" under said sixth section bars an action for a recovery; that the taking by the board of public works was under sec. 15 of the act of August 8, 1848, which provides that "in the construction of such improvements, the said board shall have power to enter on, take possession of and use all lands, waters and materials, the appropriation of which for the use of such

works of improvement shall, in their judgment, be necessary;" and that such taking was under claim of title, based upon said section ; that by ch. 98, Laws of 1853, the state granted to the Improvement Company the improvement, together with the dams, water power and other appurtenances, " and all other rights and privileges belonging to the improvement, *to the same extent* and in the same manner," that the state then held the same; that said section 17 of the act of 1848 is not technically a " written instrument," whether the act of 1853 is so or not, but the latter is a conveyance of the easement, and either is of quite as high authority as a deed or judgment; that the period of twenty years for the acquisition of an easement by prescription was fixed by the courts in analogy to the statute of limitations ; that in this case the possession, while complying with the statute in spirit, but not in letter, would have ripened into a title in twenty years (*Rooker v. Perkins*, 14 Wis., 79, 82), as was held by the supreme court of the United States in the Pumpelly case; and that, the period of limitations having been recently reduced to ten years where possession is taken under claim of title based upon some written instrument as being a conveyance, there is no reason why, in like cases, in analogy to the statute as thus changed, courts should not fix the period for acquiring an easement at ten years, where the statute is complied with in its spirit though not in its letter. 4. In support of the *fifth* defense, counsel argued that a dam "for hydraulic purposes " is a mill dam within the meaning of ch. 184, Laws of 1862, which bars the right of recovery where lands have been flowed for ten years by reason of the construction of a mill dam. They further cited sec. 16 of the act of August 8, 1848; ch. 277, Laws of 1850; ch. 283, Laws of 1850 ; sec. 2, ch. 98, Laws of 1853; and secs. 2, 3, 4, 6, ch. 112, Laws of 1856, as showing that the dams on the improvement were contemplated as creating water power, to be sold or leased for the purpose of mills; and they contended that there was no reason why such dams should be excluded from the operation of the

act of 1862. *People v. Tibbetts*, 19 N. Y., 523. 5. In support
of the *sixth* defense, counsel contended that the dam in ques-
tion is a part of a work of public improvement undertaken by
the state for the purpose of improving the navigability of waters
having an inter-state communication; which waters, navigable
in fact, were declared a common highway by statute and con-
stitutional law, and to the improvement of which both the United
States and the state were pledged by the dedication and accept-
ance of a grant of lands. From these facts they argued, (1.) That
the flowage of plaintiff's premises was the exercise of a "public
right," not included in the grant by patent from the United States
to the plaintiff's grantor; and that the government did not have
the *power* to dispose of such right. *Attorney General v. Burridge*,
10 Price, 350, 377, 411; *Mayor of Mobile v. Eslava*, 9 Port. (Ala.),
577; and authorities cited *infra*. (2.) That if the government
had power to dispose of such right to its patentee, such power
was never exercised, but the right was, by prior dedication
through grant to the state, reserved to the public; and that,
while in the Pumpelly case the plaintiff's title emanated from
the government as early as in 1852, in the present case plain-
tiff's grantor purchased from the government with notice of
such reserved right in the public, and subject to such easement
as the exercise of that right might create. *Hollister v. Union
Co.*, 9 Conn., 436, 442; *East Haven v. Hemingway*, 7 id., 186,
199; *The Elsebe*, 5 C. Rob. (Adm. R.), 174, 182; *Kutz v. Mc-
Cune*, 22 Wis., 628; 1 Wall., 113; 7 id., 272; 4 Pet., 87; and
cases cited *infra*. (3.) That if plaintiff's grantor did in fact ac-
quire said premises not burdened with the easement, then the
flowing was not a "taking" within the inhibition contained in
sec. 13, art. I. of the constitution, but that section must be con-
strued in connection with sec. 2, art. II., sec. 10, art. VIII., and
sec. 1, art. IV., which respectively declare, that the propositions
contained in the act of congress admitting Wisconsin "shall re-
main irrevocable without the consent" of the United States;
that when grants of land shall have been made, "especially

JUNE TERM, 1872. 327

Arimond vs. The Green Bay and Mississippi Canal Company.

dedicated by the grant to particular works of improvement, the state may carry out such particular works, and shall devote thereto the avails of such grants;" and that the navigable waters here in question "shall be common highways and forever free." (4.) That whether the provisions requiring compensation be qualified by the provisions relating to highways or not, there was no "taking" within the inhibition; that the damages alleged were remote and consequential, and the injuries to plaintiff "*damnum absque injuria.*" *Alexander v. Milwaukee,* 16 Wis., 247. To these points counsel cited *Hollister v. Union Co.,* 9 Conn., 435; *Lansing v. Smith,* 8 Cow., 146; *McKeen v. Canal Company,* 49 Pa. St., 424; *Monongahela Navigation Company v. Coons,* 6 Watts & S., 101; *Susquehannah Canal Company v. Wright,* 9 id., 9; *Henry v. Bridge Co.,* 8 id., 85; *P. & T. R. R. Co.,* 6 Whart., 25; *Monongahela Nav. Co. v. Coon,* 6 Barr, 379; *Mifflin v. R. R. Co.,* 4 Harris, 182; *N. Y. & Erie R. R. Co. v. Young,* 9 Casey, 175; *Monongahela Bridge Co. v. Kirke,* 46 Pa. St., 112; *Watson v. R. R. Co.,* 1 Wright, 469; *Shrunk v. Schuylkill Nav. Co.,* 14 S. & R., 71; *Rundle v. D. & R. Canal Co.,* 14 How. (U. S.), 80; *Canal Appraisers v. The People,* 17 Wend., 571; *People v. Canal Appraisers,* 33 N. Y., 461, 500; *Bellinger v. N. Y. Central R. R.,* 23 N. Y., 42; *Fitchburg R. R. Co. v. R. R. Co.,* 3 Cush., 58; *Comm'rs of Homochitto v. Withers,* 29 Miss., 21; *Hanson v. La Fayette,* 18 La., 295; *Natchitoches v. Coe,* 3 Martin, N. S., 140; *Alexander v. Milwaukee,* 16 Wis., 247; *Bailey v. R. R. Co.,* 4 Harrington, 389, 395-398; *Radcliff & Mayor,* 4 Coms., 195; *Hooker v. N. H. & N. Co.,* 14 Conn., 146; *U. S. v. New Bedford Bridge,* 1 Woodb. & M., 401; *Neaderhouser v. State,* 28 Ind., 257; *Hutchinson v. Thompson,* 9 Ohio, 52; 1 Am. Law Reg., 52 et seq.; Sedgw. on Dam. (3d ed.), 113, 114.

*Gillett & Taylor,* for respondent, in reference to the *second* defense, contended, 1. That defendant, claiming under Reed and his associates, cannot claim the privilege of the Mill Dam Act to protect them in the maintenance of a dam which, as appears

from the averments of the answer, raised the waters of lake Winnebago above their ordinary level, and is therefore in violation of the terms of the act of March 10, 1848. 2. That under the Mill Dam Act of 1840 (continued in ch. 56, R. S.), no person is entitled to the privileges of the act except one who erects a dam for the purpose of raising water to propel a water-mill *owned by himself.* This construction of the law was well settled in Massachusetts long before its adoption here. *Stowell v. Flagg*, 11 Mass., 364; *Slack v. Lyon*, 9 Pick., 62; *Boston, etc., Dam Corp. v. Newman*, 12 id., 477; *Fitch v. Stevens*, 4 Met., 426; *Hill v. Sayles*, 12 id., 148; *Murdock v. Stickney*, 8 Cush., 117; *Large v. Orvis*, 20 Wis., 696. 3. That under the act of March 10, 1848, Reed and his associates acquired no greater rights than they would have had under the Mill Dam Act if they had erected their dam across a non-navigable stream, and therefore they could claim the privileges of the last mentioned act only so long as they could show that they kept the dam for the purpose of running a water-mill, or mills, erected and maintained by themselves. *Wood v. Hustis*, 17 Wis., 416; *Crosby v. Smith*, 19 id., 449; *Fitch v. Stevens*, 4 Met., 426; *Hill v. Sayles*, 12 id., 148. 4. That the only mills protected by the Mill Dam Act are *grist and custom mills.* *Newcomb v. Smith*, 1 Chand., 71; *Pratt v. Brown*, 3 Wis., 603; *Thien v. Voegtlander*, id., 461; *Fisher v. Horicon Iron & Man. Co.*, 10 id., 351; *Newell v. Smith*, 15 id., 101. 5. That the legislature has no constitutional power to grant to a private citizen the right of flooding the lands of another citizen without his consent, by the erection of dams or obstructions across either navigable or non-navigable streams, *independent of some use* to which the obstructed waters are to be applied; such grants having been upheld only upon the ground that the use designated was a *public use.* *Roxbury Mill Corp. v. Newman*, 12 Pick., 478; 12 id., 556; *Stowell v. Flagg*, 11 Mass., 364; 8 Cush., 113, 548; 12 Met., 148. 6. That Reed and his associates having surrendered to the state their right to maintain

a dam, under their charter, for mere hydraulic purposes, and having consented that the same should become a part of the improvement of the navigation of the river, they or their assigns can only claim such rights as the board of public works, under the law, were authorized to exercise ; that they hold, therefore, only the right to so much water power as may be created by the maintenance of the works necessary to improve the river. 7. That the defense is defective in not alleging that plaintiff's lands were appropriated or condemned, and compensation made therefor.

II. In respect to the *fourth* defense, counsel argued, 1. That there could be no presumption of a grant of the right to flow lands from an adverse user of less than *twenty* years, by analogy to the statute of limitations ; that the short limitation of ten years applies only to persons who occupy lands under a claim of title founded upon a written instrument as a conveyance of the premises, or upon the judgment of some competent court ; and that the possession by flowage is analogous to the adverse possession under claim of title *not* under a written conveyance or by judgment of court, and therefore requires a possession of twenty years. 13 Wis., 139, 663 ; 14 id., 79 ; 17 id., 227 ; 19 id., 90 ; 20 id., 441. 2. That there can be no *equitable* limitation to a *legal* remedy, and a delay to prosecute such remedy does not estop the party short of the time limited by the statute. 17 Wis., 504 ; 20 id., 441.

III. As to the *fifth* defense, counsel argued that it was not good as a defense under ch. 184, Laws of 1862, because it does not allege that the dam here in question is a *mill dam*. The statement that the dam is " one of the class and character referred to in said chapter," is of a *conclusion*, and not of a fact.

IV. As to the *sixth* defense, counsel contended that the permanent flooding of lands by a public or private corporation is a " taking " of the land, within the meaning of the constitutional provision which forbids the taking of private property for public use without making compensation therefor (Angell on Water-

courses, § 465; *Hooker v. N. H. & N. Co.*, 14 Conn., 146; *Canal Appraisers v. The People*, 17 Wend., 604; 2 Johns. Ch., 166; 18 Johns., 405; 9 Cranch, 43; 2 Pet., 657; *Newcomb v. Smith*, 1 Chand., 71; *Pratt v. Brown*, 3 Wis., 613; *Walker v. Shepardson*, 4 id, 511, 512; *Fisher v. Horicon I. & M. Co.*, 10 id., 353; *Newell v. Smith*, 15 id., 104); that if a private corporation attempts to permanently appropriate private property without first making just compensation therefor, it becomes a trespasser, and may be proceeded against as such (*Robbins v. R. R. Co.*, 6 Wis., 636; *Shepardson v. R. R. Co.*, id., 605; *Powers v. Bears*, 12 id., 213; *Davis v. R. R. Co.*, id., 16; *Pettibone v. R. R. Co.*, 14 id., 443; *Ford v. R. R. Co.*, id., 609; *Loop v. Chamberlain*, 17 id., 504; *Loop v. Chamberlain*, 20 id., 135; *Carpenter v. R. R. Co.*, 24 N. Y., 655; *Wager v. R. R. Co.*, 25 id., 526; *Stacey v. R. R. Co.*, 27 Vt., 39; *Cushman v. Smith*, 34 Me., 247); that if defendant is clothed with all the rights conferred by the act of August 8, 1848, upon the board of public works, and if that act has provided no mode by which the owner can compel the appraisement of damages or the payment of the compensation, it is void (*Norton v. Peck*, 3 Wis., 714; *Shepardson v. R. R. Co.*, 6 id., 605; *Powers v. Bears*, 12 id., 213; *Pratt v. Brown*, 3 id., 603); and that the cases cited by appellant's counsel as to the power of the state to construct and improve public highways without being liable to persons whose property is injured thereby, merely show that the state owns the bed of navigable streams and the waters flowing therein, and that public corporations are not liable for mere "consequential damages" resulting to private property from the construction and improvement of highways, where there is no "taking" of such property.

The following opinion was filed at the January term, 1872.

DIXON, C. J.    The case in the supreme court of the United States of this same defendant, but of a different plaintiff, whose lands, also bordering upon Lake Winnebago, were overflowed and injured by the back water caused by the same dam or ob-

struction of the Fox river (*Pumpelly v. Green Bay and Mississippi Canal Company*, 13 Wallace, 166), decides many of the questions presented in this case, and in a manner and upon considerations quite to the satisfaction of this court as to all the questions so touched upon and considered. With some slight differences pointed out by counsel, and which we consider immaterial, the three special pleas there examined and adjudged by the court to be bad as setting up no defenses to that action, correspond entirely to the second, fourth and sixth defenses contained in the answer in the case at bar. The questions in that case, as they do in this, came up on demurrer, there to the pleas and here to the special defenses. The court, professing to act and decide as this court would do upon questions of state statutory construction and legislation and state constitutional law, and upon the examination of several of the decisions of this court bearing upon the questions presented, held :

*First*. That the act of the territorial legislature authorizing Curtis Reed and his associates to construct a dam across the northern outlet of Winnebago lake to enable them to make use of the waters of the river for hydraulic purposes, was inoperative and conferred no authority for the erection and maintenance of the dam in question, because it incontestably appears from the facts averred that such dam, or any dam suitable for hydraulic purposes, or which would create any water power at all, would inevitably "raise the water of lake Winnebago above its ordinary level," which, by a proviso contained in the second section of the act, it was expressly declared that Reed and his associates should *not* do. The language of the second section, so far as it is material, is as follows: "Said dam shall not exceed seven feet in height above high water mark of said river: *provided*, that said dam shall not raise the water of lake Winnebago above its ordinary level." It seems from the opinion that the argument upon this point was the same in the supreme court that it is here. The court say: "It is contended by counsel for the defendants, that the second section of the

Arimond vs. The Green Bay and Mississippi Canal Company.

act authorizes them to build their dam seven feet above high water mark of the *river* at all events, and that the restriction that the water of the *lake* shall not be raised above its ordinary level is only applicable to such raising, if the dam should exceed the first limitation; while the counsel for the plaintiff claims that both limitations were effectual, and that if the dam raised the water in the lake above its ordinary level, the law was violated though it may not have reached the seven feet above high water of the river." The effort seems to be to show that there is some inconsistency or ambiguity in the provisions which can only be reconciled upon the theory first above stated. Counsel say in argument here: "While the language of the proviso is plain, its meaning is ambiguous, and we are left in doubt as to what the intention of the legislature was in using it." We cannot concur with counsel in this view, that plain language leads to such ambiguity. The intention of the legislature is very plain: first, that the dam in no event should exceed seven feet in height above high water mark of the river at the place of construction; and secondly, that to whatever height built, whether the full seven feet or under, it should not in any case raise the water in the lake above its ordinary level. The provisions are therefore entirely harmonious and consistent, and counsel must fail in their effort at introducing an ambiguity upon which it was hoped the court would be led to disregard the proviso as being in conflict with the grant itself or the terms of it. Reed and his associates, representing, as we may suppose, that a dam of the height mentioned, constructed at the point named in the act, would not raise the water in the lake above its ordinary level, apply to the legislature for a grant of the privilege of building it; and the legislature, not knowing, and perhaps not caring to investigate, whether a dam so constructed will have that effect or not, grant him the privilege, at the same time providing that the dam so authorized, whether seven feet in height above high water mark of the river or of any less height, should not raise the water of the

lake above its ordinary level. The legislature were willing to grant the privilege provided such should not be the effect of the dam, and were very careful to guard against authorizing anything to be done which should have that effect. Such is the plain and obvious interpretation of the act, and no reasoning upon the subject can make it more so, nor at the same time serve to render it in any manner obscure or doubtful. The dam in question having, as appears by admissions of fact contained in the pleadings, had the effect to raise the water of the lake above its ordinary level, the supreme court held it was unauthorized by the act, and built in violation of law; and so the remedy of the plaintiff was not under the provisions of the act relating to mills and mill dams as provided by the second section of the act. And in like manner this court must hold that the dam was entirely unauthorized by the act, and that the right of the defendant in this action to keep it up without making compensation for injuries like those complained of by the plaintiff, so far as such right has been derived by assignment or otherwise from Reed and his associates, entirely fails. The provisions of the mill dam law are inapplicable, and the common law remedies, to sue for and recover the damages he has sustained, are open to the plaintiff. If any other grounds or reasons for this conclusion were necessary, they would be found, we think, in another branch of the argument of the learned counsel for the defendant, where they contend and show that the obstruction in question was not erected as a dam under the mill dam law, or under the charter to Reed and others, but as an integral and necessary part of the works for the improvement of the navigation of the river itself, and so as to make the same navigable according to the intention of congress and of the legislature of the state with respect thereto.

*Second.* The supreme court held that the damages of which the plaintiff complains are not such as the state had the right to inflict on its citizens in improving the navigation of a public or navigable river, without making compensation for them.

Arimond vs. The Green Bay and Mississippi Canal Company.

The court say that counsel for the defendant, with becoming candor, argued there, as they do here, that such was the right of the state, and that no compensation could be claimed or obtained. This proposition was stated and considered by the court as if the legislature of this state, in projecting a sys tem and providing by law for the improvement of the naviga· tion of the Fox and Wisconsin rivers, had purposely omitted to make any provision by statute for compensation to the plaintiff, or those similarly injured, for damages to their lands. This, we think, was a mistake on the part of that learned court, and it is but proper that we should vindicate the legislature against the imputation (accidental, of course,) of having intended to authorize, even if it had the power, a proceeding so arbitrary and ·at the same time so grossly oppressive and unjust. Sections 17 and following of the act approved August 8, 1848, made express provision for compensation in all such cases. Laws of 1848, 1st Sess., p. 62. It is true that counsel for the defendant argue that such provision was invalid and nugatory because the damages were "to be paid out of the fund appropriated to said improvements." Sec. 21. It is said this was an unlawful diversion of the fund from the purpose specified in the act of congress granting the lands, which was that the proceeds of the sales thereof were to be used in "improving the navigation of the Fox and Wisconsin rivers," etc. This court does not readily perceive how this position can be maintained, or why it was not a perfectly legitimate and proper appropriation of the fund. But be this matter as it may (for it seems not material to the present controversy, and is only alluded to in justice to our own legislature, and to correct what we conceive to have been a mistake on the part of the supreme court), we are entirely satisfied with the reasoning of that court upon the general proposition, and well convinced that nothing else is or could be held as the law of this state than is laid down in the opinion. That the flooding of land by water caused to be set back by artificial obstructions placed in a run-

Arimond vs. The Green Bay and Mississippi Canal Company.

ning stream is a *taking* of such land, within the meaning of the provision of our constitution requiring compensation to be made where private property is taken for public use, is abundantly established by the decisions of this court referred to in the opinion. The decision of this court in the case of *Alexander v. Milwaukee*, 16 Wis., 248, is referred to as difficult to reconcile with the other decisions, and as possibly tending to sustain the opposite conclusion, and some shade of doubt is cast upon the correctness of that decision. Whether that case was correctly decided or not, we are clear that it was an extreme application of the doctrine of *damnum absque injuria*, and that the principle of it is not to be extended to other and dissimilar cases, or to a case like the present. This court is sensible, as the tenor of the opinion of the supreme court shows, and as is shown by numerous decisions of this court, that that rule is best and most to be preferred, which will work out the greatest measure of justice between the public and individuals, and which will extend the right to compensation to the greatest number of cases where it appears that direct injury has, or, in the ordinary course of the operations of nature, must unavoidably ensue, to the property of private owners by reason of the acts of the public which are complained of. Perhaps the case of *Alexander v. Milwaukee* was such an one, and ought to have been decided differently. Of the cases where the causing of water to flow upon the land of an individual so as permanently to impair or destroy its value and usefulness, has been held a taking which requires compensation to be made under the constitution, it is probable none stronger can be found than the recent case in this court of *Pettigrew v. The Village of Evansville*, 25 Wis., 223. The question there was upon the right of the village authorities, without compensation, to turn mere surface water from a natural pond or reservoir standing in the streets upon the land of the plaintiff, which it was not pretended would permanently stand upon or cover the surface of the land, but would permanently injure and lessen

its value; and this court held the authorities of the village had no such right, and could obtain it only through an exercise of the power of eminent domain in the manner prescribed by the constitution. The case of *Alexander v. Milwaukee* was there also referred to and distinguished. After the decision in that case it is needless to pause upon the point that the flooding and injury of the plaintiff's lands here was not a taking within the meaning of the constitution.

But it is said by counsel here that the supreme court, in its consideration of the clause in the constitution (art. I., sec. 13) requiring compensation to be made for property taken for pub lic use, omitted to consider other clauses of the same instrument which are thought to have a material influence upon the question; and reference is made to sec. 2, art. II., sec. 10, art. VIII., and sec. 1, art. IX. We have examined those sections, and are at a loss to perceive how they can be held to operate in favor of the position assumed by counsel. We cannot see how the declaration that the propositions contained in the act of congress admitting Wisconsin as a state of the union, "shall remain irrevocable without the consent of the United States," nullifies or in any manner conflicts with the requirement of sec. 13, Art. I., that the property of any person taken for public use shall be paid for. Nor do we see how the provision requiring the state to devote the avails of any lands granted to the state for a particular purpose, to the purpose so indicated, in any way interferes with the performance of, or relieves the state from, the duty of making compensation for property taken by it for its use. And neither can we see how the further declaration that the Mississippi river, and the navigable waters leading into it and into the St. Lawrence, and the carrying places between the same, shall be common highways and forever free, can embarrass the state, or any agency which it may employ, in doing justice to injured parties as is declared by sec. 13, art. I., shall be done. The most authoritative, solemn and oft repeated declaration that these waters shall remain common high-

ways and forever free, can apply only to the waters themselves, and to the channels and natural beds of the streams and lakes, and not to the dry lands on either side of them.

*Third.* The supreme court, after briefly alluding to the facts, the same as stated in the sixth separate defense in this action, held that the title of the land did not come to the plaintiff from the United States burdened with an easement in favor of improving the navigation of the Fox river, which authorized the injuries complained of, and of which, therefore, he could not complain. Upon this point the court say: " We do not think it necessary to consume time in proving that when the United States sells lands by treaty or otherwise, and parts with the fee by patent without reservations, it retains no right to take that land for public use, without just compensation, nor does it confer such a right on the state within which it lies; and that the absolute ownership and right of private property in such land is not varied by the fact that it borders on a navigable stream. "

*Fourth.* The court held that a plea intended as a plea of prescription for an easement, to be good, must show an adverse user and enjoyment for a period of twenty years before the commencement of the action. The same proposition has frequently been held by this court.

It has thus been seen that the decision of the supreme court is an emphatic denial of the correctness of almost every position assumed by counsel for the defendant in support of the several defenses pleaded in answer to this action. It is almost without necessity that we here again say, that as questions of the construction of our own constitution and laws, we entirely concur in the correctness of the decision of them, and in the reasoning of the court by which the decision is sustained.

It may perhaps be expected, after the elaborate arguments which have been submitted by counsel, that something should be said by way of distinguishing this case from those in New York, Pennsylvania, Massachusetts and elsewhere, in which it has been held there can be no recovery of damages and no

action maintained to restrain proceedings on the part of the public, on account of certain injuries sustained or which will be, by the proprietors of lands bordering on navigable rivers or waters, in consequence of acts done by the public for the improvement of navigation and to subserve the public interest and advantage in that respect. Those cases regard the bed of the stream, with all the water passing in it, as strictly public property, to be used and appropriated by the public, *within* the banks and *below* high water mark, just as the public interests and necessities of navigation may dictate or require. Within these limits, that is, within the banks and below the ordinary high water mark in the bed of the stream, the public may, for this purpose, do as it pleases with the water, and the damages resulting to the riparian proprietor are *damnum absque injuria.* It may change the current or flow of the water from one side of the stream to the other or against one bank or the other; or may obstruct or impede the passage so as to check and slacken the flow and cause the water to set back; or, as has been done in some cases, the water may be diverted or withdrawn entirely from the original or natural bed, so as to make safer and more perfect navigation by some new and artificial channel. In short, the bed of the stream, with the water in it, is regarded by those cases precisely as if it were a belt or strip of dry land of equal length and width owned by the public. In that case the public might dig up the soil on one side and cast it upon the other side of the strip at its pleasure, without liability for injuries to the adjoining proprietors so long as no part of the soil itself was thrown or should fall upon their lands. The pit or excavation on one side with the pile of earth on the other provided they were injurious to the adjoining proprietors, as they well might be, would be *damnum absque injuria.* The public might dig up and remove the whole soil to the depth and with the irregularites ordinarily found in the channel of a navigable stream or river, and the owners of adjacent lands could not complain. This is what

every proprietor of land has a right to do without being required to answer to contiguous proprietors for consequential injuries which they may sustain; and it is what has been held by the cases referred to as the right which the public has and the control which it may exercise for the benefit of navigation, as the owner without qualification, for this purpose, of the bed of the stream and of all the water flowing in it. This, we think, will be found to have been the turning point and foundation principle of the decisions in all the cases to which reference has been made; and further remark, in order to distinguish them from the case at bar, is deemed unnecessary.

The third defense, setting up that the action did not accrue within ten years next before suit brought, is waived in the brief of counsel for the defendant. It is said to have been inserted by mistake, and is not relied upon.

The fifth defense, pleading the act of limitation of April 2, 1862 (Laws of 1862, ch. 184; 1 Tay. Stats., 818, § 42), is bad for several reasons. It is bad for the reason already given, that the dam in question is not a "mill dam," and therefore the act is inapplicable. It is bad, also, for the reason that it avers that the dam in controversy had been erected and maintained for the period of ten years when the act was passed, which would cut off the remedy of the plaintiff at once, giving him no time or opportunity to sue, which cannot be done. *Mecklem v. Blake*, 25 Wis., 500, 501, and authorities there cited. A statute of limitation cannot be applied to such a case.

And so far as counsel for the defendant contend for the right of flowage by prescription founded on ten years' uninterrupted adverse user and enjoyment, in analogy to the ten years' limitation fixed by statute for bringing actions against persons entering into the possession of lands under claim and color of title, this position also, we think, is untenable. Statutes of limitation are to be construed strictly, and cannot be extended to cases not within their letter. The evidence of adverse possession is also to be strictly construed, and every presumption made in

favor of the true owner. *Sydnor v. Palmer*, 29 Wis., 226, and cases cited. A prescriptive right or easement in land, acquired by adverse user or enjoyment for a period of time less than twenty years, is and has been unknown to the law, except where it has been otherwise expressly enacted by some statute. There is nothing in the possession of land by the mere unlawful and wrongful act of flowage, which should lead the court to prefer the ten to the twenty years' limitation, which last obtains where possession is taken and held without color of title. The resemblance to possession taken and held under the latter statute is much more strong and close, except where the party claiming the right may in good faith have taken a conveyance by metes and bounds of the lands flowed, and held under the same for ten years, in which case a different rule might perhaps apply. But in a case like the present, to depart from the long established and well known rule of the law, would, we think, be unauthorized and productive of much mischief. It would cut off and destroy the remedy in numerous cases where parties sustaining damages have, from one motive or another, delayed to prosecute in reliance upon the rule. If any such change is desirable, it is only proper that the legislature should make it, when it will be attended with no such injurious consequences. Past causes of action would then be saved, and the law, operating prospectively, would bar the remedy only of such as knew or ought to know its existence, and could have saved their rights by the commencement of suit in proper time.

It follows from these views that the order appealed from must be affirmed, with costs, and the cause remanded for further proceedings according to law.

*By the Court.*— So ordered.

The appellant having moved for a rehearing, the motion was denied, and the following opinion filed, at the June term, 1872.

DIXON, C. J. We have read and carefully considered the able and elaborate argument of the learned counsel for the de-

fendant, but are yet of opinion that the motion for a rehearing must be denied upon the points presented.

1. The proviso or inhibition of the Reed charter was against "raising" the water of Lake Winnebago above its ordinary level, and until it can be demonstrated that the "piling up" of the water of the lake above its ordinary level is not a "raising" of it above the same level, we must reject the position and argument of the learned counsel with respect to the construction he would have us put upon the charter. To us it is utterly incomprehensible how the water may be "piled up" and yet not "raised;" and so long as the water is raised above its ordinary level, the charter prohibits it, or furnishes no authority or license whatever for so doing. The charter does not specify or declare that the water shall not be raised by any particular natural process or mode, but does declare that it shall not be raised at all; and we cannot, therefore, stop to inquire into such processes or modes, but only whether the water has in fact been raised by means of the dam. Any raising of the water of the lake above its ordinary level is prohibited. Such we believe to be the true and only proper construction of the charter.

2. We held, in the former opinion, that the structure in question was not a "mill dam" within the meaning of the act of April 2, 1862. This was so held upon a statement found in the sixth defense contained in the answer, and which was proper to be considered in determining the question. That statement is as follows: "That the said dam, in manner and form in which it was built, contrived, erected, completed, maintained and continued, to wit, as mentioned in said complaint, was, ever since it was so built, has been, and now is, an essential, necessary and integral part or portion of the said works of improvement of the navigability of the said Fox and Wisconsin rivers, and to the proper development and enlargement of their capacity as common navigable highways." The foregoing statement, connected with the absence of any statement of facts in the fifth defense showing that the structure in question is a

mill dam, justified us, as we thought, in holding that it was not, notwithstanding the general averment in the fifth defense that it "is a dam of the class and character referred to in the act," which is no more than the statement of a conclusion of fact or of law from facts which are not pleaded. The fifth defense, attempting to set up the limitation of the act, was, therefore, as we thought and still think, in this respect faulty and imperfect, as well as inconsistent with other parts of the answer.

3. The fifth defense does not plead or profess to plead the one year limitation prescribed by the proviso of the act of 1862 for the commencement of an action for the recovery of any lands, tenements or hereditaments flowed before the passage of the act. Whether the time thereby limited was reasonable or not, or the act in that respect valid, is a question not here presented. In the case of *Berry and Johnson v. Ransdall*, 4 Metc. (Ky.), 292, and authorities there referred to, will be found very interesting discussions of this question when it shall arise.

*By the Court.*— Motion denied.